WENTWORTH, Senior Judge.
This is an appeal by Florida Nutrition Counselors Association (FNCA) from a final order of a hearing officer entered after evi-dentiary hearing on a rule challenge under section 120.54, Florida Statutes. The order invalidated one rule for vagueness but upheld four of the rule amendments proposed by the Board of Medicine (Board) and the Dietetics and Nutrition Council (Council), a sub-agency -within the Florida Department of Business and Professional Regulation (DBPR). We affirm as to Rules 21M — 49.002(6)[1] and 21M-50.002(3)(j), but reverse as to Rules 21M-50.002(3)(f), 21M-50.007(3), and 21M-50.009(1), FlaAdmin.Code. We find no law-fill basis stated in the order or record for those rules, which effectively forbid and penalize all nutrition counseling assessment methods or treatments except those taught in regular college curricula or that have received generally accepted scientific validation.
FNCA contends that all of the controverted rule amendments unlawfully enlarge, modify and contravene[2] the controlling statutory authority, including the Dietetics and Nutrition Practice Act (Ch. 88-236, Laws of Florida), Ch. 468, Part X, Florida Statutes, and related provisions.[3] Section 468.502 declares the “sole legislative purpose ... is to ensure ... minimum requirements for safe practice. It is the legislative intent that any person ... who falls below minimum competency or who otherwise presents a danger to the public be prohibited from practicing in this state.” (Emphasis supplied.)
The challenged rules read in material part as follows:
(1) 21M-49.002_ (6) Nutrition counseling does not include diagnosis, treatment, operation, or prescription for any human disease, pain, injury, deformity, or other physical or mental condition.
(2) 21M-50.007 Standards of Practice-(3) The licensee shall practice dietetics and nutrition counseling based on generally accepted scientific principles and current information. (Emphasis supplied.)
(3) 21M-50.002_ (3) Any advertisement ... shall be deemed by the Board to *220 he fraudulent, false, deceptive, or misleading if it....
(f) represents the licensee uses questionable methods of assessment or treatment when such treatment is experimental or without generally accepted scientific validation; or....
(j) makes false, unproven or misleading claims about the validity, safety, or effectiveness of any dietetic or nutrition related service, product or test.... (Emphasis supplied.)
(4) 21M-50.009 Unauthorized Devices, Testing, or Treatments. (1) In the course of dietetic/nutrition or nutrition counseling practice, licensees shall not use diagnostic and treatment instruments, devices, testing, or treatments, the use of which are not taught in the regular course of instruction in a college recognized by the U.S. Department of Education or Council on Post-Secondary Education. Instruments, treatments, or testing modalities which are unauthorized include: biological ionization, biomagnetic devices, cytotoxic testing, hair analysis, herbology, homeopathy, iridolo-gy, nutropathy and oxidation/ionization devices or psychotronics—radionics devices. (Emphasis supplied.)
The first of the challenged amendments, proposed Rule 21M-49.002(6), above, simply states that nutrition counseling shall not include “diagnosis, treatment, operation, or prescription” for human “disease, pain, injury, deformity, or other physical or mental condition.” Because the quoted terminology is identical to the definition of “Practice of medicine” in section 458.305(3), Florida Statutes, the order on appeal found the rule “made it clear that doing those things which constitute the practice of medicine is not nutrition counseling and might well subject the offender to discipline.” FNCA urges conflict with the statutory limitation in section 468.518(l)(j).[4] That provision would in terms permit “treating ... human ailments by ... nutrition practice” as statutorily defined, as a necessary inference from its provision for discipline for such treatment “by means other than ... nutrition practice as defined_” (Emphasis supplied.)
Because this proposed definitional rule amendment is construed by the order as simply restricting nutrition counselors from the practice of medicine regulated by Ch. 458, Florida Statutes, and the general terms of the rule must in all events be applied consistent with section 468.518(l)(j), there would appear to be no compelling argument for facial invalidity. FNCA makes an alternative conclusory argument as to deprivation of constitutional equal protection, asserting that no reasonable relation to the enabling statute can justify restricting nutrition counselors, but not dietitians, to the practice of medicine definition. Neither the face of the statute nor the record before us establishes error on this point. We therefore affirm the order on this issue, and also affirm with respect to subparagraph (3)(j) of proposed Rule 21M-50.002, supra, which we find properly proscribes advertising claims which are “unproven” and therefore misleading.
The second proposed rule quoted above, 21M-50.007(3), amends standards of practice for nutrition counselors to permit only “counseling based on generally accepted scientific principles and current information.” FNCA frames issues taking that language in conjunction with the third quoted rule, 21M-50.002(3)(f), which penalizes as fraudulent all advertisements representing that the licensee uses any treatment or assessment which is “questionable” when it is “without generally accepted scientific validation” or “experimental.” The gist of the argument as to these proposed rule amendments is that they do not encompass, and the record does not show, the necessary reasonable relationship to the protection of public health and safety, which is the sole permissible purpose for those regulations under section 455.201,[5] Florida Statutes, and section 468.507, supra.
*221 The order on appeal, with reference to the terminology above questioned, recites the Council’s survey of the general scientific community to identify prevailing standards for the practice of nutrition. The order finds in part as to Rule 21M-50.002(3)(f):
“Questionable methods” and “generally accepted scientific validation” are phrases which have a generally accepted meaning within the scientific community. In general, the latter refers to those principles and that pertinent information which has been effectively tested by qualified evaluators against known standards and validated by results found to be routinely consistent and reliable. This is neither difficult to understand or to follow.
As to Rule 21M-50.007(3):
To be sure, there is a plethora of information and procedures which exists on the periphery of established science and for which there is a fund of supporting information and a host of advocates. When tested in scientific evaluation against known standards and analyzed statistically for acceptance within the scientific community, this information and these procedures are usually found to be insufficiently supported and generally unaccepted in the better practice of nutrition and dietetics.
The order concludes that the Board has the duty to insure that licensees “utilize the most appropriate, proven, and reliable procedures.” The order reflects a recognition that the terms in question “require the making of value judgments, but the enforcement process provides an appropriate means for making those value judgments, and a process for their review.”
Even assuming (without deciding) that these portions of the order respond adequately to assertions of vagueness and subjectivity in the prescribed standards for practice and advertising, the enforcement process under the proposed language would clearly require only proof of use or advertisement of “unproven” methods, or those without general scientific acceptance and validation. That was precisely the fault found as a basis for reversing sanctions imposed against a doctor for failure to conform to “prevailing medical practice” in State Bd. of Medical Examiners v. Rogers, 387 So.2d 937 (Fla.1980):
“Sanctions were imposed ... because he utilized a modality not accepted by the Board as having been proven effective, not because the Board found that the treatment was harmful or that Dr. Rogers had defrauded his patients into believing that ... treatment was a cure_ [T]he state imposed limitation ... has not been shown by the evidence to have a reasonable relationship to the protection of the health and welfare of the public.... The Board’s action is an unreasonable exercise of the police power, and we affirm ... quashing the order of the Board.” 387 So.2d at 939, 940. (emphasis supplied).
Appellees would distinguish the Rogers rationale on such grounds as the vast difference in professional functions (such as patient experimentation) between practitioners in medicine and those in nutrition and the proven significant minority opinion favoring the treatment involved in Rogers. But for the purposes of state regulation here in question, we find no material distinction.[6] We therefore reverse as to this rule.
The fourth proposed rule above quoted, 21M-50.009(1), forbids use of “instruments, devices, testing, or treatments, the use of which are not taught in the regular course of instruction” in specified colleges. The order makes the following factual finding:
In that regard, most colleges do not treat extensively upon the subject of nutrition counseling which is, to a large extent, ignored by the mainstream medical profession. Most nutrition counseling techniques are taught at workshops and seminars and in apprenticeships. For this reason and because of their belief that the proposed rule does not accurately reflect the current standard of practice in the profession, Petitioners object to it. Little, *222 if any, evidence in support of this position was set forth, however. (Emphasis supplied).
The factual determinations (1) that most colleges do not teach nutrition counseling “extensively,” and (2) that most techniques are taught in other educational formats, lend support to FNCA’s argument. A primary contention here is that this proposed rule would effectively do indirectly what the Board cannot do directly, i.e., eliminate practice by those counselors explicitly “grandfathered” into licensure by section 468.51, Florida Statutes (1993).[7]. Certainly the rule would impose on those licensees, like all others, the ongoing burden of determining what specific subjects are taught in the referenced colleges from time to time. The rule effectively vests in such colleges the absolute discretion, by choice of curricula, to determine permissible “instruments, devices, testing, or treatments.” Even if we disregard potential constitutional issues, and recognize considerable latitude as to formal educational requirements for licensure (subject to the legislative “grandfather” clause), such a delegation of authority to colleges to control practice standards for licensees, absent any stated guidelines, appears to be clearly arbitrary and beyond the Board’s delegated authority. Cf. Staten v. Couch, 507 So.2d 702 (Fla. 1st DCA 1987). The rule should accordingly be stricken.
The second sentence of this rule does specify certain treatments or testing modalities which are “unauthorized,” among which there remain in issue: herbology, iridology, hair analysis and biological ionization.[8] Because this delineation of proscribed activities is made in apparent illustration of what would not be taught in the specified curricula, we find it to be an integral part of the initial standard invalidated above. It cannot, then, stand independently. We therefore do not evaluate the sufficiency of the evidence supporting the conclusions in the order on each of these activities. We note, however, as in findings on the other rules, an absence of identification of harm from the acts which are restricted.[9]
*223 For reasons above stated as to each rule, we reverse with directions for entry of an order striking proposed rules 21M-50.002(3)(f), 21M-50.007(3), and 21M-50.009(1), Fla.Admin.Code, and otherwise sustaining the challenged rules.
ALLEN and DAVIS, JJ., concur.

. Appellees reference the new numbers of the rules in question as of July 1, 1994, to be 59R-43.002(6), 59R-44.002(3)(f) and (j), 59R-44.007(3), and 59R-44.009(1), F.A.C.

. See Agrico Chem. Co. v. Dept. Env. Reg., 365 So.2d 759 (Fla. 1st DCA 1979). Among grounds listed for challenge of a rule as an invalid exercise of delegated legislative authority in Sec. 120.52(8), F.S., are:
(c) [t]he rule enlarges, modifies, or contravenes the ... law implemented ...
(d) [t]he rule is vague, fails to establish adequate standards for agency decisions, or vests unbridled discretion in the agency; or
(e) [t]he rule is arbitrary or capricious.

. Sec. 468.503 Definitions. — ■_
(4) "Dietetics and nutrition practice” shall include assessing nutrition needs and status using appropriate data; recommending appropriate dietary regimens, nutrition support, and nutrient intake; improving health status through nutrition research, counseling, and education. ...
(8) “Nutrition assessment” means the evaluation of the nutrition needs ... using appropriate data to determine nutrient needs or status and make appropriate nutrition recommendations.
(9) "Nutrition counseling” means advising ... on appropriate nutrition intake by integrating information from the nutrition assessment.

Sec. 468.507, Florida Statutes:

The board may adopt such rules not inconsistent with law as may be necessary to carry out the duties and authority conferred upon the board by ss. 468.501-468.518 and chapter 455....

. Subparagraph (j) lists as a ground for disciplinary action against nutrition counselors:
(j) Treating or undertaking to treat human ailments by means other than by ... nutrition practice, as defined in ss. 468.501-468.518.

. Sec. 455.201(2), Florida Statutes, provides "professions shall be regulated only for the preservation of the health, safety, and welfare of the public under the police powers of the state...."

. See Sec. 455.201(3), Florida Statutes (Supp. 1994): "It is further legislative intent that the use of the term "profession" with respect to those activities licensed and regulated by the department shall not be deemed to mean that such activities are not occupations for other purposes in state or federal law.”

. Section 468.51(3) provides "[t]he board shall certify as qualified any applicant who documents that the applicant was employed as a practitioner of nutrition counseling previous to and on April 1, 1988.”

. The order reads in material part:
25. Herbology is not an assessment tool but a modality. It comes closest to being classified as current information within the definition of the proposed rules.
26. Iridology, which is an analysis of the human condition through examination of the iris, is considered by the Board to be within the parameters of the practice of medicine. It is noninvasive and has not been shown to cause physical harm. It is an assessment technique but not a diagnostic tool, a cure or treatment. It is designed to show cholesterol and body acid levels, but it is, however, felt to be unproven and bordering on quackery by the mainstream medical profession whether accomplished by a medical doctor or a nutrition counselor.
27. Hair analysis, a procedure utilized by an unknown number of Association members, including its President, involves the analysis of hair samples taken from the client to determine the presence of trace minerals, and as a toxic metal screen. Though used in criminology and by the Environmental Protection Agency to detect toxic metal exposure in environmental enforcement, hair analysis is not mainstream practice and it can be influenced by numerous outside factors, including hair dye and other preparations, the age of the sample, and the like. Hair is considered a tissue sample which, under Florida law, can be submitted to a properly licensed clinical laboratory only by appropriately licensed persons. Nutrition counselors do not fall within this category. Hair analysis is not invasive nor is the gathering of hair for analysis.
28. Most clinical laboratories recognize approximately 2,000 laboratory tests. Hair analysis in [sic] not one of them. While there are many licensed clinical laboratories in this state, only eight laboratories, nationwide, do hair analysis. None are in Florida except for laboratories which perform analysis of hair samples for forensic purposes.
29. In biological ionization, used in conjunction with iridology, urine and saliva samples are provided by the client and are measured for ph factor. While this procedure is done by an unknown number of Association members, it is not considered by the medical profession to be an acceptable assessment.

.Argument is directed to the potential for financial harm from use of "unproven” treatment, but we find no evidence substantiating such an impact. Section 455.201(2)(a) provides:
(2) The Legislature further believes that such professions shall be regulated only for the preservation of the health, safely, and welfare of the public under the police powers of the state. Such professions shall be regulated when:
*223 (a) Their unregulated practice can harm or endanger the health, safety, and welfare of the public, and when the potential for such harm is recognizable and clearly outweighs any anti-competitive impact which may result from regulation.